# CURTZ v. PARK CITY CHIEF MINING CO. et al.

No. 6548. Decided October 15, 1943. (142 P. 2d, 163.)

*L. B. Wight* and *R. S. Johnson,* both of Salt Lake City, for appellant.

*E. A. Rogers* and *H. G. Metos,* both of Salt Lake City, for respondent.

McDONOUGH, Justice.

Appeal from a decree declaring that appellant held certain mining claims in trust for Curtz and requiring appellant to quitclaim said mining claims to Curtz.

The facts are numerous and somewhat complicated. We recite only those which we deem necessary to an understanding of this decision.

Rachel B. Urban died testate on or about March 23, 1933. By the terms of her will the plaintiff was made the residuary legatee and devisee. Included in the residuary estate were some fractional interests in some patented and unpatented lode mining claims in the Blue Ledge Mining District in Wasatch County, known generally as the Levary group. Her interest was alleged to be 5/16th in the patented claims and about one-half interest in the unpatented claims. There were a number of creditors' claims, which had to be satisfied out of the residuary estate. 101-3-3, U. C. A., 1943.

On April 2, 1937, before settlement of all creditors' claims had been made, the plaintiff, Edgar Curtz, individually and as "administrator" of the estate of Rachel B. Urban, deceased, together with other persons, as sellers, executed a contract to sell to defendant P. C. Reynolds, all of said mining claims for the total purchase price of $25,000. The sum of $22,500 was allocated to the patented claims and $2,500 to the unpatented claims. If Curtz could acquire by distribution from the estate the entire fractional interests which the decedent was said to have owned, his ratable share in the purchase price would have been approximately $8,280. By the terms of said contract the administrators of the estates involved were to obtain confirmation of sale in the estate proceedings. The first payments amounting to $2,200 were to be made by specified times to enable the sellers to clear the title in accordance with a title opinion rendered, and to settle the debts of the estates to prevent the properties from being sold in estate proceedings. The court appraisers valued the interest of said decedent in the mining claims at $5,500.

The initial payments on the contract amounting to $2,200 were made, but apparently nothing was done to clear the record title nor to buy in any of the adverse interests which were made to appear after some investigation. Only about $945 went to apply on the claims of creditors. In 1938 when both Edgar Curtz and E. D. Sorenson were "administrators," the latter attempted to get Curtz to raise sufficient money to pay the balance of the debts of the Urban estate then amounting to nearly $1,800. On the organization of the Park City Chief Mining Company in 1938, the contract of sale was assigned by Reynolds to said corporation. While Curtz denied he had any knowledge of this assignment, by a letter in 1939 he requested said corporation to make certain payments on his automobile and take credit on the contract. In 1940 the New Park Mining Company which claimed a contract of sale from plaintiff as to four of these same mining claims executed in 1935

or two years prior to the contract of sale of all the claims to Reynolds, instituted action against plaintiff Curtz for specific performance. E. D. Sorenson, coadministrator, made a number of threats to have a probate sale of the residuary assets to satisfy the claims of creditors unless Curtz raised some money immediately to pay said claims. No sale of such assets could be made without an appraisal within a year if sold at private sale, nor without confirmation of sale by the court.

On July 25, 1940, after some negotiations with defendant Reynolds, the plaintiff executed three instruments and placed them in the possession of defendant Reynolds: (1) A quitclaim deed executed by plaintiff Edgar Curtz, an unmarried man, covering all of said mining claims, but with the space for the name of the grantee left blank. (2) An assignment of all of his rights to distribution of said claims in the estate of Rachel B. Urban, deceased, with the right of the assignee to receive distribution in said estate matter, with the space for the name of the assignee left blank. (3) An agreement signed by plaintiff Curtz and defendant Reynolds whereby it was recited that Edgar Curtz and other joint owners of the Levary group of claims executed an agreement to sell said claims to said P. C. Reynolds, dated April 2, 1937; that Reynolds had done the assessment work on said claims and had paid to Curtz to apply on the purchase price the sum of $2,358; that Curtz was then a defendant in a suit for specific performance brought by New Park Mining Company to compel conveyance of four of said mining claims alleged to have been sold on September 23, 1935; that all performance under said contract of April 2, 1937, was thereby suspended until final determination of said action, and in case New Park Mining Company should prevail, out of the proceeds of sale to the New Park Mining Company Curtz would pay Reynolds all money paid or advanced and that portion of the money expended on said property in proportion to his ownership; provided, that if Curtz should

be successful in defending the suit, the parties should continue to be bound by said contract of April 2, 1937. The Park City Chief Mining Company, which was the assignee of said contract of April 2nd, 1937, was not made a party to said agreement. Reynolds was not an officer of said corporation, and there is no evidence that said corporation was advised as to said agreement nor that it authorized Reynolds to make such an agreement.

There is an irreconcilable conflict in certain particulars in the testimony as to the conversations which led up to the signing of these instruments, and which followed their execution and placement in the possession of Reynolds. The testimony of Curtz is that while he knew about some of the debts of the Urban Estate remaining unpaid, and the fact that he was still a coadministrator, he did not recall that Sorenson had threatened to have a probate sale of the interest owned by decedent in these mining claims to pay the debt. He claimed that these instruments were made so that if he won the suit they could be returned to him unused, but if he lost the suit, then Reynolds was to negotiate with the New Park Mining Company for as good a bargain as possible as to all of these claims. He testified that Reynolds was not to fill in the name of the grantee or assignee without the express consent of Curtz himseslf. As far as the record shows, Reynolds was acting as agent for Curtz.

Reynolds testified that the instruments were given to him to enable him to raise the money to pay off the debt of the estate. The decree settling the final account in the estate shows that the residuary estate which otherwise would have been distributed to Curtz included property in addition to an interest in the mining claims. Reynolds also claimed he was told by Curtz he could deal with anyone, and could fill in his own name if he raised the money to pay off the debts. He further testified that nothing was done to clear the title to the mining claims; and that he had learned that instead of acquiring the adverse or conflicting interests essential to enable the sellers under the contract of

April 2, 1937, to give an acceptable warranty deed and to eliminate the defects complained of and which he claimed Curtz and his attorney had agreed to clear up immediately, some of those outstanding fractional interests had been sold. From the statement made by counsel for Curtz, it appears that New Park Mining Company purchased some of the outstanding interests, and from other evidence introduced it appears that New Park Mining Company attempted to obtain for $150 an administrator's deed to the four claims on which it brought suit against Curtz. Reynolds attempted to show that Curtz had been paid everything he was entitled to receive in view of his failure to clear the record title.

After Reynolds received the instruments above mentioned on July 25, 1940, he negotiated with the officers of Park City Chief Mining Company. Whether any of the officers actually saw that the instruments were executed with the grantee clause left blank does not appear. That corporation as assignee of Reynolds' interest in the contract of sale dated April 2, 1937, claimed to be a purchaser of the property. It apparently knew of the litigation instituted by New Park Mining Company, and it discovered some of the alleged infirmities in title. It also knew that there was danger that there would be a probate sale of the interests Rachel B. Urban owned in the claims if the debts were not paid. The officers of the corporation accepted Reynolds' offer to deliver the assignment if sufficient funds were raised to pay the balance of the debts. The officers discussed the matter of the amount of the debts with E. D. Sorenson, the administrator. Before the negotiations were completed, Curtz resigned as an administrator and left for California. The balance of the debts and court costs and counsel fees aggregating $2,023.76 was paid on or before December 4, 1940, by the officers of Park City Chief Mining and some of the stockholders.

The final account of the estate had been prepared in June, 1940, which recited that Curtz had paid the balance

of the debts of the estate, and Sorenson, who became the sole administrator, credited all of the money received from the Park City Chief Mining Company by way of Reynolds, as coming from Curtz. Someone filled in the name of Park City Chief Mining Company as the assignee, with a rubber stamp. The insertion was made sometime between July 28 and December 4, 1940. On the latter date Sorenson as administrator acknowledged receipt of the assignment and it was recorded on the same date. The final account and petition for final distribution was set for hearing and came on for hearing on December 16, 1940.

By the terms of the probate decree the interest which Edgar Curtz would have received in all of said mining claims as part of the residue of the estate as residuary devisee and legatee was distributed to Park City Chief Mining Company by virtue of the said assignment dated July 25, 1940. The balance of the property constituting the residuary estate was distributed to Curtz, including a residence in Park City.

No motion was ever made to vacate, modify or set aside the decree of distribution in the probate matter. By this suit Curtz seeks not to overthrow the decree, but he seeks to have the court treat Park City Chief Mining Company as constructive trustee for him and to have a conveyance of the mining claims made to him. The lower court granted judgment and directed the mining company to convey the mining claims to Curtz, quieting title in Curtz, subject to the provision that it would not pass on the question as to the rights under the contract of April 2, 1937. The court took the position that the mining company as assignee of the purchaser was put on notice of the fact that the space for the name of the assignee was left blank when the instrument was executed for the reason it was subsequently filled in with a rubber stamp, and that it had a duty to inquire as to the authority of Reynolds to enter into such a transaction which would reduce the purchase price payable to Curtz. The decree does not allow the appellant min-

ing company any charge, lien or claim for the money it advanced to make settlement of the estate possible nor which made distribution of other assets to Curtz possible.

The appellant corporation on this appeal attacks the proceedings, judgment and decree on four grounds: (1) That plaintiff attempts to make a collateral attack by this action on the probate decree distributing the property, without a legal or equitable right to do so. (2) The findings are contrary to the evidence and the judgment is contrary to the evidence and law. (3) The assignment as delivered through the agent of Curtz was a valid instrument and a valuable consideration was paid therefor. (4) Even if plaintiff could maintain such an action, he is not entitled to set aside the assignment without making restitution of the funds paid to settle the debts of the estate which constituted a lien upon the residuary assets to which he was entitled to distribution only after such charges were paid.

The question of collateral attack on the probate decree need not be considered for such decree is recognized and its validity to pass title not questioned. The fact that the distributee may have received it for certain purposes, one of which was to reconvey, on the happening of certain conditions, does not affect the validity of the decree. The court will construct a trust in the distributee to accomplish the understanding of the parties. A part of the understanding, knowledge of which the Mining Company must be deemed to have been charged with, is that the property was to be conveyed back to Curtz upon his prevailing in the Park City suit.

We think there was substantial evidence to support the findings. The decree should, however, be modified so as to give the appellant a lien for such moneys as it advanced to pay the debts of the Urban estate, the trial court to determine the amount of the same.

The rights of the appellant under the contract of April 2nd, 1937, and the status of that contract were not affected by the decree of the lower court. The decree expressly

refrained from any determination "as to whether it was binding or in force and effect and what rights the parties to this action have under said contract."
This was correct. The status of the said contract or the rights of the parties under or in reference to it were not in issue in this action and are not before us for review. That part of the decree which reads "and that the defendants herein, and all persons claiming through or under them be, and they are forever barred, restrained and enjoined from asserting any right, title or interest in the interest or ownership of plaintiff in and to the above described property after the said five day period hereinabove specified" should be omitted. The action was not one to quiet title and if the contract gives the appellant or Reynolds any rights in the property they must not be barred from asserting them.

In addition to impressing a lien upon the mining claims, the decree should provide that if it should in a proper action be determined that the contract of sale dated April 2, 1937, was in force at the time the advances were made by appellant to discharge the debts of the Urban estate, appellant may, if it so elect, have the amount of the lien applied toward payment of the amount of the purchase price found to be due to Curtz. Under such circumstances Curtz may not tender the money for which the lien is given and refuse to allow appellant to have it applied on the contract so as to have an excuse for forfeiture which otherwise might not exist. The granting of such lien is not to operate to impair any right of action appellant as assignee of the purchaser might have for breach, if any, of said contract of sale or for the enforcement thereof.

The question of whether if appellee proceeds to exercise any claimed right of forfeiture because of failure to pay installments in the time provided by the contract, the appellant may show justification or excuse for failure to make the payments in time because of its supposition that it had full title to the mining claims, is of course also open

to determination under the general statement above made that rights under the contract are not in this action decided.

The case is remanded to the lower court for further proceedings as hereinabove directed. No costs allowed.

WOLFE, C. J., and LARSON and WADE, JJ., concur.

MOFFAT, Justice (dissenting).

Rachel B. Urban died testate on or about March 23, 1933. Charles Barnes was appointed executor of her will. Other than filing an inventory and publishing notice to creditors, the administration of the estate seems to have been inactive under the Barnes executorship. He died March 18, 1936. In about April, 1937, E. D. Sorenson and Edgar Curtz, sometimes referred to as Eddie Curtz, were appointed co-administrators of the estate of Rachel B. Urban, deceased. Curtz says he was a special administrator. Whether Curtz and Sorenson were administrators with the will annexed does not appear. Curtz says he resigned and Sorenson continued administration and distribution.

Rachel B. Urban, at the time of her death, was the owner of an undivided interest in a number of mining claims situated in the Blue Ledge Mining District in Wasatch County, Utah, some of them patented and some unpatented. Curtz was the residuary devisee. By her will (not in the record) Mrs. Urban devised her interest in the mining claims to Curtz. They are named as follows: Primrose, Leonard, Monitor, Levary, Lion, Woodchuck, Amanda, General Jackson, Silver Star, designated as Lot 3768, and Valco No. 5, designated as Lot 3766, patented claims, and Tillman, Josephine, Tillman Extension, Valdemar, Urban, Teller, and Teller Fraction Lode Mining Claim, unpatented.

On April 2, 1937, a few days before the appointment of Sorenson and Curtz as administrators, Curtz and the other parties interested in the mining claims as coowners entered into a contract of sale, captioned "Option to Purchase,"

with P. C. Reynolds. The contract provided that there were claims against the estates mentioned in the contract; that title was to be perfected; and claims against the estates were to be discharged. The property referred to was then to be distributed to the signers and by them conveyed to the buyer or his assigns. Payments were to be made to Lafayette Anderson as agent for the sellers. Differences arose between Mr. Anderson and the sellers. Thereafter, dealings and payments were handled directly between the parties. This contract is not mentioned in plaintiff's pleadings. It was the second item of written evidence introduced by plaintiff and was regarded as in full force and effect. It had been assigned some years before the filing of this action to the Park City Chief Mining Company.

The status of the contract of April 2, 1937, above outlined, was by subsequent events affirmed by a memorandum between Edgar Curtz and Philip C. Reynolds dated July 25, 1940. This memorandum of agreement recites, insofar as material here, that $2,358 had been paid upon the contract, that Reynolds was in possession of the property and "had occupied and performed assessment work" on the property. It also recited that "Curtz had been made a defendant in an action for specific performance of a contract alleged to have been made by him under the name of Eddie Curtz with the New Park Mining Company, a corporation, on September 23, 1935, by which said Curtz is claimed to have sold 'four of the claims included in the contract of April 2, 1937 (the Reynolds Contract) to the New Park Mining Company'." That suit was at the time undetermined. It was then agreed by the memorandum of July 25, 1940, that performance of the contract with P. C. Reynolds should be suspended until final determination of the action by said New Park Mining Company, and that in case said mining company was successful in said action, then out of the proceeds of said sale to said mining company Curtz should repay to said P. C. Reynolds all money which said Reynolds had paid or advanced to him; also the money expended by

Reynolds on the property in proportion to whatever ownership Curtz may have therein. It provided that should Curtz be successful in defending the suit the parties should continue and be bound by their said contract of April 2, 1937.

Bearing the same date as this memorandum, Curtz signed an assignment of all "his right, title and interest" in the named mining claims, also a quitclaim deed to the same with space for the name of an assignee and grantee, respectively, left blank and delivered them to P. C. Reynolds. On April 25, 1938, a memorandum between Edgar Curtz and E. D. Sorenson was signed, as follows:

"It is hereby understood and agreed that I, Edgar Curtz have this day made, executed and delivered to E. D. Sorenson a quitclaim deed conveying all my right, title and interest to all the mining property belonging to the Rachel Urban, estate, with instructions to make delivery of the said deed upon the payment to him of the sum of $2,500.00 which sum is to be paid to me as a consideration for my interest as an heir at law of the estate of Rachael Urban, deceased. It is further understood that the purchasers of said mining property is to pay all costs of probating said estate, and unpaid claims, which claims amount to about $700.00.

"E. D. Sorenson agrees not to deliver said deed until he is paid the sum of $2,500.00 as above provided for, and when so paid agrees to deliver said sum to Edgar Curtz. Also collect sufficient moneys to pay costs of probate and unpaid claims against said estate."

The name of the grantee is not disclosed. Sorenson testified the deed referred to was subsequently destroyed. Curtz knew that the contract of April 2, 1937, was still in force, as the following letter discloses:

"Salt Lake City, Utah.
"April 22nd, 1939.

"Park City Chief Mining Co.
"McCornick Building
"City.

"Gentlemen:

"Out of any money due and payable to me arising from a certain contract of sale wherein you are buying from me an undivided interest in what is generally known as the Levary group of mining

claims in the Park City, Utah mining district, you will please pay to the General Finance Company not less than twelve payments of $48.50 each due in monthly payments starting May 25th, 1939.

"You may take credit on said contract for any and all payments so made.

"(Sgd)  Eddie Curtz."

This order was written before the assignment and deed of July 25, 1940, and no other contracts or agreements are referred to in the record out of which the Park City Chief Mining Company might "take credit on said contract for any and all payments so made."

Also, on July 25, 1940, the following agreement was entered into between Edgar Curtz and Philip C. Reynolds:

"This agreement, made this 25th day of July, 1940, by and between Edgar Curtz, sometimes known as Eddie Curtz, of Park City, Utah, hereinafter designated as Seller, and Philip C. Reynolds, of Salt Lake City, Utah, hereinafter designated as buyer,

"Witnesseth: That the seller, for and in consideration of the promises, covenants and agreements of the buyer promises and by these presents hereby sells to said buyer 18,000 shares of Park City Chief Mining Company, a Utah corporation, for the sum of $900.00, payable as hereinafter stipulated.

"And the said buyer, for and in consideration of the premises, promises and agrees to pay to said seller the sum of $25.00 per month until said agreed purchase price shall have been fully paid.

"It is mutually agreed that the said buyer shall be entitled to make payment of any of said monthly installments in advance, and shall be entitled to receive and have issued to him such stock as he shall have paid for at the rate of Five (5c) Cents per share.

"Witness the hands of the parties hereto this the day and year first above written.

"Witness:  L. B. Wight.

"(Sgd)  Edgar Curtz
"Philip C. Reynolds."

The Park City Chief Mining Company was incorporated before July 25, 1940, and probably after April 2, 1937. The exact date is not revealed by the record. The contract of April 2, 1937, was transferred to the Park City Chief

Mining Company in December, 1938, about the time of its organization.

In addition to the quitclaim deed, and on the same date, July 25, 1940, Curtz executed an assignment, which reads:

"I, Edgar Curtz, sometimes known as Eddie Curtz, for and in consideration of ONE DOLLAR to me in hand paid, and other valuable consideration, the receipt of which is hereby acknowledged, do hereby

"Sell, set over, transfer and assign to Park City Chief Mining Company, [inserted by rubber stamp] a corporation, of Salt Lake City, Utah, all my right, title and interest in the Primrose, Leonard, Monitor, Levary, Lion, Woodchuck, General Jackson, Silver Star and Amanda Lode Mining Claims, Lot No. 3768; Marcella, Lot No. 6760; Valeo No. 5, Lot No. 3766; Rillman, Josephine, Urban, Tillman Extension, Valdemar, Teller and Teller Fraction Lode Mining Claims, located in Blue Ledge Mining District, Wasatch County, Utah, and all rights and rights of action which I may own or to which I may be or become entitled as distributee under and by virtue of the will of Rachel B. Urban, late of Park City, Summit County, Utah, and I hereby direct. that all my right, title and interest in said property, and all rights and rights of action which I may own or to which I may become entitled, against the co-owners of said mining claims or any of them, be distributed by the Probate Division of the Third District Court of Utah, for Summit County, Utah, directly to my said assignee.

"In witness whereof, I have hereunto set my hand this 25th day of July, A. D., 1940.

"(Sgd)    Edgar Curtz

"State of Utah, County of Salt Lake.    ss.

"On this 25th day of July, A. D., 1940, personally appeared before me, Edgar Curtz, the signer of the foregoing instrument, who duly acknowledged to me that he executed the same.

"(Sgd)    L. B. Wight, Notary Public.
"(Seal)                    Residence:    Salt Lake City.

"My Commission expires April 15, 1941.

"The above assignment was received by me this 4th day of December, 1940.

"(Sgd)    E. D. Sorenson,
"Administrator Estate of Rachel Urban, Deceased."

There is no dispute about the fact that the assignment contained a blank space where the name, "Park City Chief Mining Company, a corporation," has been filled in. Curtz, in his complaint, alleges:

"3. That on or about the 25th day of July, 1940, in Salt Lake City, Utah, the said plaintiff executed, acknowledged and delivered an assignment and a quitclaim deed to the mining claims above described to the defendant, P. C. Reynolds, in which assignment no assignee was named but was left in blank and in which quitclaim deed no grantee was named but was left in blank; that at the time of the delivery of said assignment and quitclaim deed to the said P. C. Reynolds, it was orally agreed between the plaintiff, and said P. C. Reynolds that he would hold said assignment and quitclaim deed until an action then pending against said plaintiff, Edgar Curtz, was determined, in which action said plaintiff, Edgar Curtz, was a defendant and the New Park Mining Company plaintiff, and it was further orally agreed that if the New Park Mining Company failed in its action, the assignment and quitclaim deed were to be returned to the plaintiff and if the said New Park Mining Company prevailed in such action, the said defendant, P. C. Reynolds, was to attempt to reach a settlement with said New Park Mining Company of said action and sell said mining claims to said New Park Mining Company and if the price of the sale of said claims was satisfactory to the plaintiff, upon plaintiff's direction, the said P. C. Reynolds was to insert in said assignment and quitclaim deed the name of the New Park Mining Company; otherwise, the said P. C. Reynolds was to return and re-deliver said instruments to the plaintiff."

Curtz testified substantially as alleged in regard to that matter. Reynolds denies that there was any limitation as to whose name should be filled in; that the documents of July 25, 1940, were delivered to him for the purpose of raising money to pay the debts of the Rachel B. Urban estate. For sometime the administrator of the Urban Estate had been urging Curtz either to mortgage the property or some of it or sell it or a part of it to raise money to pay the debts of the estate and expenses of administration.

Curtz had become a stockholder in the Park City Chief Mining Company to the extent of at least 18,000 shares which he had agreed to sell to Reynolds for the sum of $900.

By an order also dated July 25, 1940, directed to Philip C. Reynolds, the latter was directed as follows:

"You are authorized to deliver to L. B. Wight in full payment for his services in the case of the New Park Mining Co. vs. Eddie Curtz five thousand shares of Park City Chief Mining Company. (Sgd) Edgar Curtz."

In addition to these complications, Attorney Sorenson, as administrator of the estate, had obtained a tax deed from Wasatch County to the "Primrose, Leonard, Monitor, Levary, Lion, Woodchuck, Amanda, General Jackson, Silver Star Con group situated in Blue Ledge Mining District, Area 151.256 acres."

The trial court is in a better position to judge as to the credibility of witnesses and to weigh their testimony than may be done from the record alone. I am convinced plaintiff failed to sustain his burden of proof of the allegations contained in the third paragraph of his amended complaint above quoted, and in my opinion the court's finding that he did so sustain it is error.

Curtz had become so involved in the affairs of the Park City Chief Mining Company that his interest was subserved by dealing with that company. He knew, as acknowledged in writing, that it was the holder of his contract of sale. He had been receiving, or at least had ordered payments to be made and credit to be allowed on the contract. He was pressed for funds. He could not sell to anyone else without breach of his contract. The company, according to the testimony of the administrator and others and as shown by the petition for distribution, had paid the claims against the estate in the sum of $1741.29.

In answer to the question, "You didn't want the New Park Mining Company to have the property, or to buy it from the Urban estate, did you?", Curtz replied, "I didn't care who bought it, just so I could get some money, so that I could get some medical attention." Again, referring to a letter written by his wife, he said in substance that he

knew he was not getting a fair deal and wanted to do business with somebody he could get some money out of. Curtz denied that he gave information to his wife upon which she stated in a letter to Mr. Sorenson that "these two were to be filled in by P. C. Reynolds or whomsoever he wished their names put in." (Quitclaim deed and assignment.)

The trial court found,

"That the defendants [Park City Chief Mining Company and P. C. Reynolds] have no title, interest, claim or ownership in said property described in said assignment and quitclaim deed *by virtue thereof*, and plaintiff is the owner *of that interest* subject to any claims of the *defendant* set forth in the contract of April 2, 1937 which contractual rights are not at issue in this action and are thereby not determined." (Italics added.)

The judgment or decree, among other things, orders:

"That the title which the defendant, Park City Chief Mining Company, a corporation, holds by virtue of the assignment executed by the plaintiff on July 25, 1940, and recorded in the office of the County Recorder of Wasatch County, Utah, on or about the 6th day of December, 1940, and purporting to assign and convey to the defendant, Park City Chief Mining Company, all of his right, title, and interest in the mining claims hereinafter described and authorizing said defendant to receive said property as distributee under and by virtue of the last will and testament of Rachel B. Urban, deceased, and by virtue of the decree made and entered in the estate of Rachel B. Urban, deceased, on or about December 16, 1940, in the District Court of Summit County, State of Utah, whereby said property hereinafter described was distributed by said court pursuant to said purported assignment to said defendant, Park City Chief Mining Company, is held by said defendant, Park City Chief Mining Company, in trust for the plaintiff, Edgar Curtz, sometimes known as Eddie Curtz; said property consists of plaintiff's interest in the estate of Rachel B. Urban, deceased, being approximately 5/16 interest in the patented and over 8/16 interest in the unpatented following mining claims located in the Blue Ledge Mining District in Wasatch County, Utah, to-wit: Primrose, Leonard, Monitor, Levary, Lion, Woodchuck, General Jackson, Silver Star and Amanda Lode Mining Claims, designated by the Surveyor General as Lot No. 3768, and Tillman, Josephine, Tillman Extension, Valdemar and

Urban Lode Mining Claims. Valeo No. 5 Lode Mining Claim, designated as Lot No. 3766, Teller and Teller Fraction Lode Mining Claims."

The Park City Chief Mining Company is then ordered to

"execute and deliver to the plaintiff a quitclaim deed conveying to the plaintiff the title and interest derived by said defendant by virtue of said assignment and decree of distribution aforesaid, and in default of the execution and delivery of said deed by said defendant this decree shall have the effect and operation, at law and in equity, of such conveyance, so as to vest the title to the interest derived by said defendant by virtue of such assignment and decree of distribution in said plaintiff; and that the defendants herein, and all persons claiming through or under them be, and they hereby are forever debarred, restrained and enjoined from asserting any right, title, or interest in the interest and ownershop of plaintiff in and to the above described property after the said five day period hereinabove specified."

And continuing the decree further provides:

"3. That the property above described was subject to a contract between the plaintiff and others as sellers, and the defendant P. C. Reynolds, as purchaser, said contract having been executed on April 2, 1937, but no decree is entered respecting said contract as to whether it is binding or in force and effect and what rights the parties to this action have under said contract.

"4. That the quitclaim deed executed by the plaintiff on July 25, 1940, is void and plaintiff is entitled to withdraw said instrument from the exhibits in this action and have the same returned to his possession."

The execution of the decree would create a situation more difficult to untangle than the court started with. Respondent claims that "equity has declared the appellant * * * is a constructive trustee," and cites In re Miles' Estate, 1924, 63 Utah 144, 223 P. 337; Dunn v. Wallingford, 1916, 47 Utah 491, 155 P. 347; In re Estate of Ryder, 1903, 141 Cal. 366, 74 P. 993; and Snyder v. Murdock, 1903, 26 Utah 233, 73 P. 22. These cases have nothing to say about trusts, constructive or otherwise; but, as respondent sug-

gests, they "establish the proposition that disputes or controversies concerning the validity of assignments made while an estate is in the process of administration or after the death of the decedent, are controversies belonging to the equitable jurisdiction of the courts." This is quite true. In those cases the validity of assignments was presented to and determined by a proper proceeding to establish the validity or want of it in an assignment; and after such determination a decree was either made or directed to be made accordingly in the probate court.

The decree of distribution in the Rachel B. Urban Estate was made upon petition duly noticed and upon the evidence produced and at that time unquestioned. The distribution to the Park City Chief Mining Company was based upon the assignment of July 25, 1940, delivered to Reynolds and by him filled in with the name of the Park City Chief Mining Company. Whether Reynolds had authority to fill in the name, whether the Park City Mining Company was advised of conditions, limitations or other questions relating to the validity of the assignment were questions that should have been presented to the probate court and the issues determined there or by a proceeding in equity and then a decree entered accordingly.

Respondent was a devisee, had been an administrator, knew of the necessity that the debts of the estate had to be paid before the estate could be distributed; that he had no funds to meet the required payments; that the administrator had been threatening to sell or mortgage some of the residuum of the estate to pay the debts; that the property was under contract of sale and yet when the notice of distribution was duly made, he made no objection and continued dealings with Reynolds on Park City Chief Mining Company stock.

Whether or not Reynolds was authorized to insert the name of the Park City Chief Mining Company, the decree of distribution is a valid and binding decree, as admitted by both sides to the controversy. Had the court limited its

findings and decree to the single question of the validity of the assignment, the only real question pleaded, the assignment might have been voided without other order or decree. So limited, the issues would have been simple, but would still have required another action to have solved many of the problems presented.

The first item of written evidence offered by plaintiff after the notice of lis pendens was the contract of April 2, 1937, between Curtz and others and Reynolds, which had, with the knowledge of Curtz, been assigned to the Park City Chief Mining Company. This contract in evidence opened the subject matter of a long and complicated course of dealing.

Thus, a situation was presented which cannot be harmonized without doing violence to any just or equitable solution: (1) The contract of April 2, 1937, is recognized as valid and subsisting, but "no decree is entered respecting said contract as to whether it is binding or in force and effect and what rights the parties to this action have under said contract." (2) There are others interested in the property not parties to this action as shown by the contract of April 2, 1937. Their interests are not determined, and may not be determined without making them parties, or their successors if such there are. (3) The findings and decree are indefinite and uncertain as to the exact interest of Curtz in the Rachel B. Urban Estate. It is said:

"the title which the defendant, Park City Chief Mining Company, a corporation, holds by virtue of the assignment executed on July 25, 1940, * * * is held by said defendant, Park City Chief Mining Company, *in trust* for plaintiff, Edgar Curtz, sometimes known as Eddie Curtz; said property consists of plaintiff's interest in the estate of Rachel B. Urban, deceased, to wit, *being approximately 5/16 interest in the patented and over 8/16 interest in the unpatented following mining claims."* (Italics added.)

(4) There is the provision in the decree that the "Park City Chief Mining Company within five days after the

signing of this decree, execute and deliver to the plaintiff a quitclaim deed conveying to the plaintiff the title and interest derived by said defendant by virtue of said assignment and decree of distribution aforesaid, and in default of the execution and delivery of said deed by said defendant this decree shall have the effect and operation at law and in equity of such conveyance." Then all persons are "forever debarred, restrained and enjoined from asserting any right, title or interest in the interest and ownership of the plaintiff" in the described property, describing all of it. Such decision settles nothing and is only an invitation for continued litigation of the same subject matter. (5) There are no allegations or proof of any fraud in the probate proceedings upon the petition and hearing for final distribution.

With reference to constructive or resulting trusts, the authorities are numerous that a constructive or resulting trust may be declared by a court of equity through a direct attack upon a probate decree. This court has held in line with the authorities that judgments and decrees entered by courts of competent jurisdiction where jurisdiction of the subject of the action and of the person has been properly obtained, can only be assailed on a direct appeal or in equity by direct attack for extrinsic, as distinguished from intrinsic, fraud, misty as the distinction at times may be. *Weyant* v. *Utah Savings & Trust Co.*, 54 Utah 181, 182 P. 189, 9 A. L. R. 1119.

A generally accepted standard definition of *extrinsic fraud* consists of some fraud practiced directly upon the party seeking relief against the judgment or decree whereby that party has been prevented from presenting all of his case to the court. The rule is also laid down that intrinsic fraud would not justify equitable intervention. Judgments will not be vacated merely because they were obtained by perjured testimony, forged documents or bribing of a witness.

"The extrinsic fraud, which alone will warrant a court of equity in setting aside a judgment or decree, consists of such fraud as prevents a real trial upon the issues involved in the case, like conduct which prevents the injured party from receiving notice of the action, or which causes the absence of necessary witnesses." *Caldwell* v. *Taylor et al.*, 218 Cal. 471, 479, 23 P. 2d 758, 760, 88 A. L. R. 1194, and cases cited.

Hence, we have title in the Park Chief Mining Company by the decree left standing as valid yet a split of some sort by a quitclaim deed based upon an assigned interest.

Summarizing the positions of Curtz in his dealings, obligations and activities in relation to the property (not chronologically arrayed), the following are shown:

(1) In 1935 he entered into a contract with the New Park Mining Company to sell four claims to that company, that were already under contract of sale recognized as valid. Later a suit was brought against Curtz by the New Park Mining Company for specific performance. This suit was determined in favor of Curtz not long before the present action was filed.

(2) In 1937, Curtz had entered into a written agreement with Reynolds to sell all the claims included later in the 1935 contract and others. Among the recitals of the 1937 contract, after naming other estates, among which is that of Rachel B. Urban, deceased, we find, "the said administrators shall secure confirmation" of the contract from the court, "that property is now a part of and being administered in those certain estates above described, * * * that it is understood between the parties hereto that said estates are indebted to divers persons whose claims have been filed and approved." It is then agreed that $200, the first payment, has been paid. Abstract showing clear title is to be furnished and payments are to be made in installments.

(3) On April 25, 1938, a memorandum of agreement shows that Curtz had "executed and delivered a quitclaim deed" conveying all his interest in the property of the Urban

estate and delivered it to E. D. Sorenson to be delivered upon payment of $2,500. The unnamed grantee was to pay all costs of probating the estate.

(4) On July 25, 1940, Curtz had become a stockholder in the Park City Chief Mining Company, and authorized P. C. Reynolds "to deliver to L. B. Wight, in full payment for services in the case of New Park Mining Company vs. Eddie Curtz, five thousand shares of Park City Chief Mining Company."

(5) On July 25, 1940, Curtz agreed to sell 18,000 shares of Park City Chief Mining stock to P. C. Reynolds at five cents a share, to be issued to him as paid for at the rate of $25 or more a month, the total purchase price being $900.

(6) By an order dated April 22, 1939, signed by Curtz, he directed the Park City Chief Mining Company to pay the General Finance Company twelve payments of $48.50 each, starting May 12, 1939, for which he said, "You may take credit on said contract for any and all payments so made."

(7) On July 25, 1940, Curtz agrees that the contract of April 2, 1937, shall continue in full force and effect, and "that should said Curtz be successful in defending said suit [the New Park Mining Co. suit] the parties hereto shall continue and be bound by their said contract of April 2, 1937." In the same agreement it is recited that P. C. Reynolds had occupied the property, performed the annual assessment work thereon and had paid and advanced to Curtz to apply on the purchase price a total of $2,358. While recognizing the 1937 contract, he had nevertheless delivered a deed for all his interest to Sorenson and agreed to accept $2,500 for all his interest.

(8) As indicated, in addition to the assessment work, no value for which is shown, the sum of $2,358 and the creditors' claims as shown by the petition for distribution amounting to $1,741.29, had been paid. Whether the 18,000

shares of stock of the Park City Chief Mining Company were in part payment on the contract or for the assignment does not appear, nor what payment had been made or liability existed under the order for $48.50 a month for twelve months, allowance for which was to be made on the contract, is not made to appear.

(9) Who holds or claims other interests in the property is not shown, nor is the evidence definite enough to justify the court in finding or decreeing what interest Curtz has in either the patented or unpatented mining claims. It may be the other owners, if such there are, outside of those who are parties to the contract, may agree. We cannot say.

I think the judgment and decree of the lower court should be reversed. The cause should be remanded with the suggestion that all the issues be pleaded. If it be ultimately determined there is a resulting trust, the Park City Chief Mining Company should be reimbursed or be given a lien upon the property. The contract is valid, therefore such credits as the company is entitled to should be allowed, and the contract be pursued according to its terms. Equity having assumed jurisdiction should make a determination of all issues, thereby preventing a multiplicity of suits involved in the one general problem.